Mercifully Mercifully The audience is taking the break. I know. Did you notice that? They're all getting a little bored. They're all getting a little bored. Yeah. High-fiving. Quiet, please. Case 14-5297, Valeria Tanco et al. v. William Haslam et al. Oral argument not to exceed 15 minutes per side. Mr. Whalen for the appellants. Good afternoon. Good afternoon, Your Honors. Joseph Whalen on behalf of the Tennessee defendants. This, too, is a recognition case. It involves couples who were married validly in the states of California and New York, and they asked for Tennessee to recognize their marriages. If I could, Your Honors, I want to touch on rational basis and try to explain to the court why, at least in Tennessee's case, the conclusion that Tennessee's laws satisfy the rational basis test is undeniable. And then, time permitting, I want to try to enter the fray a little bit on the fundamental right question and explain why rational basis review is appropriate. Tennessee articulates its rational basis for its laws just a little differently. So let me explain how we articulate that. It does tap into the link between procreation and marriage. The legitimate interest of the state is to ensure that when children are born, particularly children who are born and the pregnancy is accidental, that they will be born into a stable family unit, i.e. marriage. Obviously, opposite-sex couples procreate, and accidental pregnancies in particular are of concern with opposite-sex couples. That thinking does not apply for biological purposes and reasons to same-sex couples. So the connection between the legitimate interest is certainly rational, and it explains the classification between opposite-sex couples and same-sex couples. The thinking just does not extend and apply. We submit that there is nothing at all irrational about that connection, and that's why the conclusion that there's a rational basis is inescapable. Now, the plaintiffs and others, of course, have said things like, well, the exclusion of same-sex couples doesn't further a state interest, and the inclusion of same-sex couples would not hurt anything, and the inclusion of same-sex couples would actually further advance state interests. Regardless of the answers to those questions, the rational basis review is over. Those questions are irrelevant at that point. Really what they amount to, if the court should agree that there is a rational basis along the lines that as we articulate it, they really amount to policy arguments for why there ought to be same-sex marriage recognized,  about whether Tennessee's laws indeed have a rational basis. We urge the court to conclude that they do. Now, here's why the rational basis review is the only level of review that the court ought to entertain. On the question in front of... Maybe as to that first point, I mean, I think the way you constructed it is right in the sense that you can, under rational basis review, a legislature can address a problem one step at a time, which means the first step can be underinclusive, and then the next step one hopes follows, you know, if it's the right choice to extend it eventually. But isn't it true that there are some cases that say it's just so underinclusive that you can't use the one step at a time point? So how do you deal with that? Because I do think they're saying that. I think your Honor is correct that there are cases that say that. We, of course, don't think that that situation is present here. And further, I would say that to the extent that the court starts to engage in examining the quality of that assessment and how well it works and how much that interest is served, I think we've now crossed the line into identifying a substantial interest, or excuse me, an important interest and a substantial relation. In other words, I think we've crossed the line into something other than rational basis review. The questions that I've alluded to that are not a proper part of the rational basis test here is exactly the kind of line drawing that your Honor makes reference to and the kind of line drawing that the legislature is entitled to engage in. On the fundamental right question, let me ask the court to look at it this way. If one goes back and looks at the early Supreme Court cases in which the right to marry was established as being fundamental, it refers to marriage in terms of not only being fundamental to the very existence and survival of the race, but also it talks about its importance and need for the establishment of society. In other words, what it's talking about, of course, is the procreation element. And it was necessarily contemplating a marriage between a man and a woman. And every case to which the plaintiffs have cited in support of their position has necessarily involved a marriage between a man and a woman. No one can deny that marriage has other aspects, particularly as we look at it today. The personal commitment and emotional aspects of marriage are important. But they are not the reason that the Supreme Court identified it as a fundamental right. The reason that it's a fundamental right is necessarily linked to the procreation element and so therefore is necessarily linked to its being defined  With respect to Windsor, I echo some of the sentiments and points that have been made by my colleagues on the state sides. Let me offer and add this observation with regard to why Windsor does not dictate the result here, as the plaintiffs would suggest to the court. As has been suggested to you already, the state's power to define marriage was of central importance in that case. And every time references made to the effects, namely the negative effects that DOMA had on same-sex married couples in New York in that case, what should append every one of those references, and indeed in the court's opinion it does on occasion, but for this court's purposes I think what should append every one of those references are the words within the same state. That was the problem with DOMA, is that it was targeted in the court's view, not at same-sex couples in general, but at the same-sex couples who had married validly in the state of New York. So the situation cannot be translated to Tennessee's law, despite the efforts of the plaintiffs to do that. As some of the discussion that has already been had indicates, and as the court's questions suggest, the definition of marriage that Tennessee's laws codify is the same definition that has always been, and Tennessee's laws in particular state that Tennessee shall not recognize any marriage from another state that would be prohibited under Tennessee's laws. So it does not single out same-sex couples, and it is not a stark departure from what Tennessee has done in the past. So the connection that the plaintiffs try to make to the reasoning in Windsor simply does not apply. We submit that any kind of heightened scrutiny is not applicable here. Only rational basis review applies, and that if the court applies rational basis review, it can come to only one conclusion, and that is that Tennessee's laws satisfy the constitutional demand. And in the end, again, as has been suggested earlier today, that is the only question. Not what Tennessee ought to do, or what it should do, or what would be a good idea for it to do, but what the Constitution under the 14th Amendment demands that it do. And we submit that the answer to that question is that the Constitution does not demand that it recognize same-sex marriage. I'd like to reserve the remainder of my time if there are no other questions. Mr. Whelan, that's fine. You'll get that. And Mr. Harbison. Good afternoon, Your Honors. May it please the Court. I'm Bill Harbison of the Nashville Bar, and I'm here on behalf of the plaintiffs who are the appellees in the Tennessee case. The Court's heard a lot of discussion, and I'm not sure I can add a great deal, but I will try to make my argument in three parts. First, the plaintiffs in our case are three couples who are married under the laws of New York or California. They happen to be same-sex couples. They were relocated to Tennessee for different reasons, having to do with jobs and even the United States military. Tennessee has laws that mandate that their marriages not be recognized in Tennessee. This case challenges the validity of those laws. The first point I would make about the context in which we find ourselves, and I don't think there's much controversy about this, is that Tennessee's laws do, in fact, cause harm to the plaintiffs. They cause harm to people similarly situated. It's an extreme intrusion into a relationship that they formed validly, voluntarily. They not only asked for benefits, but they assumed obligations to each other and to their children. And there are children in our case. There's been a child born during the pendency of the case. I don't think that the effect of Tennessee's laws in harming these plaintiffs is really in controversy. So that's my first point. Can I ask you, I'm afraid this shows some cluelessness on my part, but am I right in understanding that you have not challenged Section 2 of DOMA? You've just challenged the nonrecognition state law? I mean, our complaint challenges the state nonrecognition laws, right. I don't think it's been defended on the basis of Section 2 of DOMA. Well, I'm actually coming at this from a slightly different angle. I may not understand the question. Well, nor may I, which is odd. So you know what Section 2 of DOMA says, right? I mean, it says no state shall be required to give effect to an out-of-state same-sex marriage. That's what Section 2 says. Plaintiffs in your case have not challenged that. So I'm just trying to figure out procedurally what happens if you win. In other words, let's just say, you know, you're right. I mean, it's a preliminary injunction right now, but let's just say there's a final injunction. The state, I'll even call it anti-recognition law, is invalidated. Given Section 2 of DOMA, wouldn't the state be able to still say, listen, okay, fine. But we're relying on DOMA here. DOMA says we don't have to recognize this out-of-state marriage. And does the court's question presume then that there would need to be further litigation somehow? I don't know. I guess I'm theoretically wondering why you can't win or can't get relief without knocking out both. State law and Section 2 of DOMA. That's my real question. The truthful answer is that neither party has talked about Section 2 of DOMA. So it wasn't defended on that basis, and we didn't see the need to challenge it. The state doesn't need to defend it. In fact, arguably they're being very sneaking and not telling you about it because now they can't lose. Well, in other words, they have a whole card or something. Is that what the court thinks?  I just was looking around this afternoon and found it puzzling. I would think this. I would think that if Windsor means what we think it means. And Section 2 is illegal? And obviously they didn't address Section 2 in the opinion, but I'm talking about the logical extension of what it means. And if this court rules that Tennessee has to, under the Constitution, recognize these marriages, then I don't think that would be a legitimate issue for the state to raise at that point. It would have been dealt with. Well, it's very true. If you take the Michigan and Kentucky case, part of the Kentucky case, if our court, the Supreme Court, says the state can't deny a marriage license to a same-sex couple, you're right, this all doesn't matter. Right. But if that's not true, I take it you still believe there's a non-recognition argument. Well, we still believe that if the court decides a non-recognition case on a constitutional basis, as we urge it to do, then it seems to me that resolves it. That resolves the question. Huh. Just because the state can't do it, the national government can't do it? Well, I would think that would be true. But, I mean, the court's question, if I really understand it, I may not again. I'm sorry. Is there some other step that would have to happen? Yeah. That may be the question. Okay. Well, if you have any great insight, let us know. Okay. I will. I will, Your Honor. He frequently has great insight. Excellent. Excellent. We'll try to do it before we issue an opinion. Your Honor, I was on the point that there is no question that there's harm to the plaintiffs in this case and don't think it's seriously contended otherwise. And we have briefed the questions, and the court has already heard multiple arguments of why we would think heightened scrutiny should apply to the case. Well, can I take you back just a minute before we get to the heightened scrutiny? Yes, Your Honor. Let's assume we're talking about rational basis now. Can you explain to me? Mr. Whalen is a good lawyer, too. No offense personal or otherwise meant here, but can you explain to me what his formulation of the rational basis for this law is? Your Honor, I was making notes, and I can't because I hear the word procreation, just as we heard in the Kentucky defense. And, of course, And accidental procreation. Procreation and accidental procreation, both of which occur, both within marriage and outside marriage. And for the life of me, I cannot see a logical connection between the effect of these laws, which is to exclude recognition of a category of marriages, and promoting anything having to do with procreation one way or the other. And, in fact, the trial court below analyzed this under the rational basis test simply because she felt that no purpose that had been asserted passed even that level of scrutiny. And that is an easy way to analyze these questions without having to decide whether, basically, the fundamental right that is involved here, which is the right to marry, should invoke stricter scrutiny, whether, as it did in Windsor, whether the equal protection problems that exist should invoke heightened scrutiny. All of those analyses, any level of Constitution analysis, points to some way to formulate a state interest, a legitimate state interest, and some rational connection between that law and the state interest. I don't think this is exactly the way Mr. Whelan said it, but let me say it this way and just tell me why this doesn't make some sense. Assume rational basis. Assume the basic rule you're allowed to do things one step at a time. Now imagine a world without marriage. So there's no such thing at all. So, obviously, there's no discrimination. There's nothing. The state says, well, gosh, this is problematic. We have men and women, and when men and women are getting together, producing children, and they say to themselves, we need to do something about that, and it would be good for the children to say that when men and women have a child, they're actually in a committed relationship, because otherwise God only knows what happens with that child and whether one or both or no parents take care of it. So it doesn't seem to me irrational, a government presented with a world without marriage, that step one would be dealing with the kind of first obvious issue, the first obvious issue being the possibility of children through male-female relationships. And then having done that, step two is to decide when mores change, when the appreciation, the view of marriage has moved from a vision that's just about... Wait a minute. Did you institute marriage? I'm sorry I missed that. There was a world with no marriage. Step one. So no marriage at all. Step one has marriage. Well, you left that out. I just want to point that out. Step one is having marriage just for opposite-sex couples, because that's the first problem you decide to deal with. Over time, you realize that marriage is not just procreation. It's love, affection, and commitment. And step two is that the states eventually, and as many states already have, say, wait a second, this institution works for both. So is the hypothetical, Your Honor, dealing with the pacing question? It really is a way of dealing with the pacing question, but I guess what I'm saying is if rational basis allows for dealing with problems one step at a time, I guess it's not obvious to me why that's irrational. First, about the procreation problem, and second, well, wait, this is really about love and affection, and we should extend it to everybody. But, Your Honor, we're certainly not in a hypothetical world here. I mean, you know, we have marriages, and the plaintiffs in this case are married. They are married. So steps one, two, and three, and four have happened in real life. Not in Tennessee. We're not in a world, because these plaintiffs are married and do have children. But no, Tennessee's at step one. Well, Tennessee is not at step one. Tennessee has had marriage and then has passed laws in the face of the possibility of gay and lesbian people getting married. Tennessee passed laws to prevent recognition of those marriages. That's historically what has happened. And I don't want to use the word animus if the court is offended by that, but, I mean, it's the historical truth that these laws were passed, just like the Federal Defense of Marriage Act was passed, in the face of these societal developments, right, to stop recognition of those marriages. That's what has, in fact, occurred. And the question, I think, before the court is, what is the reason? What would have happened in Tennessee without the non-recognition statute? What would have happened in Tennessee without the non-recognition statute? Yeah, and what would have happened pre-'96 and pre-DOMA? Well, first of all, Tennessee wouldn't have had a constitutional prohibition against recognition. I get that, but I'm just curious how the law worked pre-'96, pre-this amendment. Well, I think the truthful answer, Your Honor, is that the law didn't really envision. I mean, I have to admit, just as Justice Kennedy said in the Windsor case, I mean, this concept has not, gay and lesbian people were not stepping forward and asserting their rights in the past, and so this concept wasn't considered. As I recall, I don't know when it may have gone down or been repealed, but in 96, sodomy was still a crime in Tennessee. Yes, I think Tennessee was in that vanguard. It would have been like Lawrence v. Texas. So that's the truthful answer, if I'm understanding what the court's asking. That was the context, and we don't dispute that historical context, and we also don't think the context should be ignored, that as states began permitting gay and lesbian people to marry, laws have been passed in some states, including Tennessee, to prevent that, to prevent recognition of that. It's as if Tennessee wants to wall itself off from the reality that gay and lesbian people are marrying in other states, and as because we live in one mobile society, some of those people are going to move to Tennessee, as they have done in this case. But you still get back to that happened, those are laws that were passed, and what is the state's purpose for that? It's not incrementing, legislating incrementally isn't the purpose. That's why I think the hypothetical maybe doesn't fit that the court asked. We're not legislating incrementally here. What Tennessee was doing is having marriage and having the normal place of celebration rule that Tennessee had always honored, which is that people who were married elsewhere and moved to Tennessee would be considered married in Tennessee, except for some outlying issues. That was the general rule, and Tennessee acted to prevent that. To me, the court needs to ask, why did Tennessee do that? What was the reason for Tennessee doing it? The reason that they've given is procreation. There's not a logical link between procreation and what these laws are attempting to do. They don't further procreation. They don't make accidental procreation less likely or more likely. They don't have a connection with that purpose. To go back briefly to the court's other question about, and I forget the name of the case, but the police force case, where there is a law that differentiates based on age. I think that was the hypothetical, or not hypothetical, it's the real case in that instance. There at least, that was a law that wasn't tailored well to the situation because certainly there would be 50-year-old people who would be perfectly fit. So the law isn't a good fit. But at least, and I think this hasn't been said yet, but at least in that case, it seems to me anyway, there's some logic between age and fitness, some logical link between age and fitness. A 25-year-old is generally more fit than a 50-year-old, generally. So there is some logical connection, and I think a court could get there on a rational basis test. I have not heard in four hours of today. How about accidental pregnancies? Sorry? How about accidental pregnancies? Well, accidental pregnancies occur, but how does excluding a category of people from marriage prevent or encourage accidental pregnancy? I don't see how it is connected to that. Well, I thought what you were saying was there was some connection in Mergia between saying age and physical fitness. There's something there. Could be. At least I could see that you could use common sense to say there might be some connection. That's all I was saying. Here, accidental pregnancies are neither made more – people are not more likely to be channeled into heterosexual marriages because of these laws. There's no logic there. We would submit, and I don't think the court has heard, a logical explanation as to why the existence of these laws does something to make accidental pregnancies handled better or make them less likely or anything. I just don't think there's a connection. And the absence of that connection, the absence of really any state interest, is central, I think, to the case. And, again, under any constitutional framework, we think the court should strike these laws down. And I see that my time has expired. Thank you, Your Honor. Thank you for your excellent argument. We appreciate it. Mr. Whelan. Your Honor, Mr. Harbison said something that I think is important, and this isn't personal to him, so let me see if I can couch it in a way that it's not directed at him in particular. But he said he couldn't see any possible connection between excluding same-sex couples and the interest that Tennessee has identified, that being ensuring that when children are born, they're born into a stable family unit. And I get it. As long as one is insisting upon asking the question that way, how does excluding same-sex couples further the state's interest, then it's going to be hard to see the point. But this is what I was trying to get at earlier, and that is that's not the question. The question is including opposite-sex couples furthers the state's interest because it's opposite-sex couples who are having the children that we're concerned about. And they're going to go on having those children. They're going to go on getting married. They're going to go on having children. It's happening in 21 states where same-sex marriages are allowed. I'm sorry, I'm struggling too. I just don't quite get the picture. There's nothing about this that has stopped any heterosexual couple from getting married, discouraged them from getting married, kept them from procreating deliberately or accidentally.  I understand, Your Honor. But I suggest that all of those observations that you're making are all a product of asking the other questions that aren't part of the analysis. No, no, no, they're not. If you didn't have in Tennessee a law or a constitutional amendment outlawing forbidding same-sex marriages, people would still get married. They would still procreate deliberately or accidentally. Life would go on just the way it has gone on. What is the point? My answer is that the rational basis analysis is limited to the classification. Is there a rational relationship between the classification and the legitimate interest that the states identified? And when you look at it that way, all you're asking is, is there a rational basis? What is the classification then? The classification is between opposite-sex couples on the one hand and same-sex couples on the other. And the only question that one asks is, is there a rational basis upon which to distinguish between opposite-sex couples and same-sex couples? And the answer has to be yes. It always has to be yes. And I understand the other observations beyond that, and I think that's all the things that you're talking about. But they don't answer the strict rational basis question that needs to be asked and answered, and that question has to be answered yes. Let me see if I can run this by you then. There are two different classifications here, same-sex couples and opposite-sex couples. And the thing that the state of Tennessee wants to do is to encourage the opposite-sex couples to get married and to have children. No, that's not the legitimate interest that Tennessee has. Oh, okay. That's what I said at the beginning, that our articulation is narrower than that. It is specifically to ensure that when children are born by opposite-sex couples that they are born into a stable family unit, period. Okay.  Again, Your Honor, with all due respect, you are asking me a question that's not part of the rational basis analysis. All that I need to say is they've identified opposite-sex couples. Does that explain why same-sex couples are not included? And our answer has to be yes. It does explain the distinction. And we're done. That's our only point. Well, we're done seemed rather appropriate. I've got 35 seconds, Your Honor. You can add a coda or you can stick with we're done. No, in closing, particularly since I am the last on the list, let me just say California and New York in this case have expanded their definition of marriage. That was an entirely proper exercise of their sovereign authority, but so was Tennessee's decision to limit its definition to the definition that it's always had. Thank you. Thank you, Mr. Whalen. Thank you, Mr. Harbison. We really appreciate your briefs and argument and answering our questions. That case too will be submitted. I'm right in thinking that's it. I'm being hopeful at this point. I really want to thank the lawyers again and to the extent your clients were helping you on this and coordinating all these briefs and the amicus briefs. We really appreciate it. We have a lot of great input here, and we're really grateful for it, and I'm really hopeful it will help us reach what I'm afraid counts as an interim decision. I don't think anyone is under the illusion this is the end of the road for anyone, so we'll do our best with it, try to do it quickly. I also want to thank the clerk's office led by Ms. Debbie Hunt for just doing a fantastic job in working with you all and getting this set up today. So we're really grateful to everyone for that, and thank you, Debbie, to you and your staff. So that case is submitted, and the clerk may adjourn court.